IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TONYA FARLEY,<br><br>Defendant. | Case No. 3:23cr68-RCY |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Erik S. Siebert, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney; and Harmeet Dhillon, Assistant Attorney General, Kathryn E. Gilbert, Special Litigation Counsel, and Katherine McCallister, Trial Attorney, hereby submits its position with respect to sentencing for defendant Tonya Farley. The United States has reviewed the Presentence Investigation Report, and does not dispute any of the facts or factors set out therein. ECF No. 383. The defendant's applicable Sentencing Guideline range, based on her Total Offense Level of 20 and her Criminal History Category of I, is 33 to 41 months of imprisonment. *Id.* at ¶¶ 72–73. The United States submits that a Guideline sentence would be sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

I. **FACTUAL SUMMARY**

W.W. was an inmate in the custody of the Bureau of Prisons ("BOP") Federal Correctional Institution, Petersburg. Beginning in the early morning hours of January 9, and continuing until his death on the morning of January 10, W.W. exhibited sudden and severe medical symptoms, including incontinence, incomprehension, incoherence, and the inability to stand or walk.

Without medical attention to address his apparent crisis, W.W. fell into walls and other objects over and over again inside his cell, and later, in a suicide watch cell, where he fell at least fifteen times, often striking the walls and floor. At approximately 6:30 a.m. on the morning of January 10, W.W. fell headlong into a doorframe, hitting his head and spinning as he fell to the ground. This was his last fall. As W.W. laid alone on the floor, naked and covered in bruises and abrasions, no correctional officer responded to his medical emergency or otherwise rendered aid to W.W. for nearly an hour and forty minutes. When staff finally responded and called emergency medical technicians, W.W. was pronounced dead. An autopsy would later conclude that W.W. died of blunt force trauma to the head and that he sustained multiple skull fractures and extensive scalp hemorrhaging. According to the medical examiner, had W.W. been hospitalized and examined at any point in his ordeal, he would have lived.

      Defendant Farley was the only nurse to medically assess W.W. in the medical unit during his medical ordeal, and she drafted a report that accurately noted defendant Farley's observations of the victim's obvious and alarming symptoms: that W.W.'s pulse was pounding at 130 beats per minute; that he was not oriented to person, place, and time; that he had been reported to have fallen by his cellmate; that he had a visible abrasion on the right side of his head; that his pupils were dilated; that his speech was slurred; that his gait was unsteady. Defendant Farley admitted on cross-examination at trial that she knew that she should call a physician about W.W., and she knew that she should have sent W.W. to the hospital, but she did neither of these things.

      Instead, despite being fully cognizant of W.W.'s condition, defendant Farley misled psychology staff to ensure W.W. was placed in the suicide observation cell—a locked, single-occupant cell—where, without any additional medical attention, W.W. would continue to fall and suffer. Shortly after arranging for W.W.'s transfer to the suicide observation cell, Defendant

Farley left the facility without notifying any other medical provider of W.W.'s symptoms and medical need, without checking on W.W. again, and without seeking any additional care for him. Prior to departing the facility that evening, though, defendant Farley took steps to conceal her failure to obtain care for W.W., writing in her official report the false assertion that she had notified a doctor about W.W.'s condition.

Over the next ten hours, after defendant Farley had facilitated his placement into the suicide observation cell, into the morning of January 10, W.W. fell repeatedly, slamming into walls, the cell door, and the concrete floor. At approximately 6:30 a.m. that morning, W.W. took his final fall, colliding head-first into the wall and then collapsing to the ground. W.W. laid on the ground, dead or dying, for an hour and forty minutes before any correctional or medical staff responded. By the time correctional and medical staff arrived to W.W.'s cell, life-saving efforts failed and W.W. was later pronounced dead.

In the aftermath of W.W.'s death, defendant Farley, confronted with questions about her actions that evening, chose to double-down on the false statements in her report, falsely assuring her supervisor (Health Services Administrator Captain Terry Kilpatrick) and a co-worker (Health Information Technician Angela Reese) that she had, in fact, contacted a physician about W.W. during her shift.[1]

Defendant Farley later gave a voluntary interview to federal investigators during which she repeatedly lied in a continued effort to cover up her role in W.W.'s death. Defendant Farley again repeated the false claim that she had spoken with a doctor about W.W.—but this time, defendant

---

[1] *See* Trial Tr. Dec. 12, 2024, Testimony of Captain Terry Kilpatrick, at 1236 (Testifying that he spoke to defendant Farley "a couple of days" after the victim's death, and "I asked [defendant Farley] did she call the on-call physician, and she told me yes, she did."); Trial Tr. Dec. 16, 2024, Testimony of Angela Reese, at 1617-19 (Testifying that she spoke with defendant Farley a day or two after the victim's death, and that defendant Farley had said "she wanted to send [the victim] out to the hospital." Reese also testified that defendant Farley claimed that the victim was not sent to the hospital because "the on-call doctor didn't want to send [the victim] out.").

Farley chose to embellish this false story, telling the investigators that that the reason she had not sent the victim to the hospital was because the on-call physician discouraged her from doing so. Defendant Farley fabricated the length of this phone call, invented details about who called whom and from where, and falsely described the contents of the conversation. By the time defendant Farley testified at trial, however, she admitted this story was completely false; that she had not spoken with any physician about W.W.; and that no physician had discouraged her from sending the victim to the hospital. To the contrary, defendant Farley admitted on cross-examination that she knew at the time she examined the victim that W.W.'s serious medical need required hospitalization, but that she nevertheless failed to obtain a higher level of care for him.

Defendant Farley also falsely told federal investigators during her voluntary interview that Dr. Biber had told her that W.W. was malingering (that is, faking his symptoms). Dr. Biber testified at trial, however, that she did not say as much to Farley and that she (Dr. Biber) would never diagnose an inmate over the phone with malingering, because she would need to see and assess the inmate to make that determination. Specifically, Dr. Biber testified that defendant Farley called her and described symptoms that seemed potentially medical in nature, while leading Dr. Biber to believe that defendant Farley had evaluated those symptoms. Dr. Biber told defendant Farley that Dr. Biber would not authorize suicide watch based on that information. At that point, defendant Farley made up a story about another nurse telling her that W.W. had been seen with a razor hours earlier, apparently to get Dr. Biber to agree to authorize suicide watch for W.W. At that point, Dr. Biber testified that although she was shocked by defendant Farley's failure to report this information earlier, Biber authorized suicide watch.

## II. PROCEDURAL SUMMARY

Defendant Farley was charged by way of a Superseding Indictment returned on August 1,

2023 with Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242 (Count Two); False Report, in violation of 18 U.S.C. § 1519 (Count Four); and False Statements, in violation of 18 U.S.C. § 1001 (Count Five).  ECF No. 34, PSR ¶¶ 1-5.  The defendant proceeded to a jury trial, conducted from December 9 through 21, 2024.

On December 21, 2024, the jury convicted defendant Farley on Count Five, and acquitted her on Counts Two and Four.  ECF No. 313.

On April 24, 2025, the U.S. Probation Office issued its final PSR as to the defendant.  ECF No. 383.  As described below, the United States agrees with the defendant's guideline range, as calculated in her PSR.

The PSR calculated the base offense level for a violation of 18 U.S.C. § 1001 pursuant to U.S.S.G. §2B1.1(a)(2).  *Id*. at ¶ 36.  The Probation Officer correctly concluded "that that the acquitted conduct that forms the basis for Count Two establishes, in whole or in part, the instant offense of conviction, pursuant to §1B1.3."  *Id*. at A-1.  The Probation Officer accordingly applied several enhancements under Chapters Two and Three of the Guidelines:  first, the Probation Officer applied an eight-level upward adjustment pursuant to § 2B1.1.(b)(16)(A) because the defendant's offense conduct involved the conscious or risk of death or serious bodily injury; second, the Probation Officer applied a two-level upward adjustment pursuant to § 3A1.3 to account for the victim's physical restraint in the course of the offense; third, the Probation Officer applied a two-level upward adjustment pursuant to § 3A1.1(b)(1) to account for the defendant's knowledge of the victim's vulnerability; and fourth, the Probation Officer applied a two-level upward adjustment pursuant to § 3B1.3 to account for the defendant's abuse of her position of public trust in the course of her offense conduct.  *Id*. at ¶¶ 37-40.  Ultimately, the PSR concluded that the defendant's applicable Guideline range for the underlying offense was 33 to 41

months' imprisonment, based on her total offense level of 20 and a criminal history category of I. *Id*. at ¶¶ 72–73. The PSR identified no factors that would warrant a departure from the applicable Guideline range. *Id*. at ¶ 74.

The Government has no legal or factual objections to the PSR.

The defendant objects to every adjustment applied by the Probation Office, and additionally asserts that she should receive a reduction pursuant to U.S.S.G. § 4C1.1. *See id*. at Page A-2–A-4. The defendant has also objected to "much of the offense conduct section" of the PSR. *Id*. at A-4.

### III. Guideline Calculations

The Probation Office correctly calculated defendant Farley's guidelines. The United States will review defendant Farley's sentencing position paper(s) and further respond to defendant Farley's objections, as appropriate, in the United States' Response pleading.

#### A. The Probation Officer Correctly Concluded that the Defendant's Acquitted Conduct Giving Rise to Count Two Qualifies as Relevant Conduct

The underlying conduct that led to defendant Farley's need to lie to federal investigators is properly considered relevant conduct; indeed, the essence of and motivation for defendant Farley's false statements stemmed from her failure to provide the victim with the medical care she knew that the victim needed. The defendant was convicted at trial of lying about (1) notifying a doctor about the victim's condition, and (2) the defendant's efforts to put the victim in an observation cell rather than send him to the hospital—in short, the very conduct that the defendant lied to conceal and cover up (her failure to notify a doctor and her failure to send the victim to the hospital) evinced and established the defendant's deliberate indifference to W.W.'s medical need. If defendant Farley had actually reported the victim's symptoms to a physician, as she acknowledged she was required to do, rather than misleading a psychologist about the victim's condition, then she would

6

not have needed to falsely represent to a special agent that she had discussed the victim's symptoms with a physician. That deliberate indifference—the defendant's knowing failure to take appropriate action to address the victim's serious medical need—led to her lying about her actions to the federal investigators inquiring about the defendant's actions on the evening of January 9, 2021. Without it, there would have been no need to make false statements. As a result, the acquitted conduct helps to establish the defendant's § 1001 conviction.

The Fourth Circuit has recognized as much, holding that when a defendant was convicted of structuring transactions to evade reporting requirements, during which he "concealed" his prior illegal conduct "from law enforcement investigators," that prior illegal conduct was properly considered relevant conduct. *See United States v. Agyekum*, 846 F.3d 744, 751–52 (4th Cir. 2017) ("[P]erhaps most importantly, [the defendant's] ongoing drug distribution activity produced the illicit cash that [the defendant] deposited in banks in a manner designed to conceal his overall illegal activity. Specifically, by evading reporting requirements at the banks, in violation of the structuring law, [the defendant] concealed his illicit drug activity from law enforcement investigators. In light of this evidence, we have little difficulty in affirming the district court's conclusion that [the defendant's] ongoing drug dealing activity was conduct engaged in during his structuring offenses, making it relevant conduct under § 1B1.3(a)(1)(A)."). There, as here, the defendant was engaged in ongoing illegal conduct. Defendant Farley began lying about her treatment of W.W. the moment she called Dr. Biber. After Dr. Biber refused to authorize defendant Farley's plan to put W.W. in suicide watch, defendant Farley fabricated a reason to put him there. Defendant Farley continued her efforts by writing a false report to cover up her inaction, lying to her colleague and her supervisor as soon as the next day to cover up her inaction, and ultimately lying to federal investigators to cover up her inaction.

Other courts have reached similar conclusions regarding offenses involving deceit. *See*, *e.g.*, *United States v. Young*, 266 F.3d 468, 477–78 (6th Cir. 2001) (because defendant's "underlying embezzlement activity significantly facilitated" the "basis of his money laundering conviction," the "embezzlement conduct was necessarily conduct relevant to the money laundering offense" and therefore constituted relevant conduct as an act taken "in preparation for" the offense of conviction); *United States v. Cianci*, 154 F.3d 106, 108, 112–13 (3d Cir. 1998) (defendant's uncharged acts of embezzlement that "lead[] to his receipt of the income he failed to report" were properly considered relevant conduct for tax evasion convictions).

### B. The Probation Office Correctly Applied a Two-Level Upward Adjustment Because W.W. Was a Vulnerable Victim

The Probation Office correctly applied a two-level adjustment for W.W.'s status as a vulnerable victim. W.W. was "unusually vulnerable due to . . . physical or mental condition [and was] particularly susceptible to the criminal conduct." § 3A1.1(b) & comment. (n. 2). Indeed, it is difficult to imagine a victim more vulnerable than W.W.: He could not talk, stand or walk without falling, or control his bladder. According to the witnesses who observed him, he did not appear to understand what was happening. He could not advocate for himself or ask for help. The victim's physical and mental state was comparable to that of a child who could not yet talk. *See United States v. Drapeau*, 110 F.3d 618, 620 (8th Cir. 1997) (holding that vulnerable victim enhancement properly applied where child victim "did not have the physical ability to protect himself . . . [and] could not talk").

Further, defendant Farley knew of the victim's vulnerability, because she observed W.W.'s condition and symptoms both in his housing unit and during her clinical encounter. *See United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010) (stating that, under § 3A1.1(b)(1)'s "two-prong test for assessing the application of the vulnerable victim adjustment . . . a sentencing court must

8

[first] determine that a victim was unusually vulnerable . . . [and, second,] assess whether the defendant knew or should have known of such unusual vulnerability."). Appellate courts have upheld trial courts' application of this enhancement in far less compelling circumstances. *See*, *e.g.*, *United States v. Harris*, 576 F. App'x 265, 274 (4th Cir. 2014) (upholding application of enhancement where victim was a board-certified anesthesiologist who was also HIV-positive and seeking treatment); *United States v. Stella*, 591 F.3d 23, 30 (1st Cir. 2009) (upholding application of enhancement for patients who could presumably speak and advocate for themselves but who, "had no way to help themselves [] because of their pain and their medical conditions, to detect or prevent against the drug dilution").

### C. The Probation Office Correctly Applied a Two-Level Upward Adjustment Because W.W. Was Restrained

The Probation Office correctly applied a two-level upward adjustment for restraint, because W.W. was restrained in ways additional to his lawful detention. The restraint of victim adjustment applies when a victim is "physically restrained in the course of the offense." U.S.S.G. § 3A1.3. "Physically restrained" means "the forcible restraint of the victim," including but not limited to "being tied, bound, or locked up." U.S.S.G. § 1B1.1, comment. (n. 1(K)). The Fourth Circuit has held that these and other, less restrictive actions constitute restraint under this provision. *See*, *e.g.*, *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (upholding application of § 3A1.3 enhancement where defendant-bank robber moved hostage to a room and physically barred her from leaving); *United States v. Wilson*, 198 F.3d 467, 472 (4th Cir.1999) (holding someone at gunpoint during the commission of an offense, without physical contact or moving the victim into a separate, confined space, can constitute "physical restraint"); *United States v. Little*, 175 F.3d 1017 (4th Cir. 1999) (holding that the defendant's "use of force to control and direct [the victim's] movement against his will amounts to physical restraint."). Additionally,

9

federal courts have applied the restraint adjustment to lawfully incarcerated victims where the victims were restrained in a cell other than their housing unit. *United States v. Wilson*, 686 F.3d 868, 872 (8th Cir. 2012) (upholding application of physical restraint adjustment in a conviction for 18 U.S.C. § 242, where the defendant moved the inmate victims from their regular cells where they were safe to violent cells where they were assaulted).

In this case, the victim was restrained—repeatedly—during the course of the offense. Defendant Farley personally engineered, or at the very least facilitated, multiple such instances of the victim's restraint: first, directing that the victim be transported (in handcuffs) to the medical unit for assessment; second, directing W.W.'s transfer from the medical unit to the suicide observation cell, a movement that entailed prison staff strapping the victim to a medical stretcher and transporting him to the suicide watch cell; and finally, ensuring that W.W. was placed in the observation cell, where he was confined alone inside the locked, single-occupant suicide watch cell for ten-plus hours until his death. Defendant Farley's efforts to ensure that W.W. was involuntarily placed in that suicide watch cell deprived W.W. of his permanent housing unit and the presence of the cellmate who had repeatedly advocated to get W.W. medical care and attention, and left W.W. alone in a remote and more restrictive area of the prison to be observed by fellow inmates who themselves were locked in a separate, neighboring room and provided only a phone that could call a single officer for help. Defendant Farley's decision to remove W.W. from his cell and to deposit him into the suicide observation cell was designed to isolate W.W. within that cell, where he died from his continued, repeated falls into the walls and floor.

### D. The Probation Office Correctly Applied a Two-Level Upward Adjustment for Abuse of Trust

The Probation Office correctly applied a two-level upward adjustment for Abuse of a Position of Trust, pursuant to § 3B1.3, because defendant Farley, as the medical professional

responsible for assessing and responding to W.W.'s obvious medical needs, abused her "professional or managerial discretion" in choosing to decline to provide or obtain medical care for the victim (knowing that her refusal to do so—and her announcement of the same to correctional staff—foreclosed any practical hope of W.W. receiving medical treatment that evening). U.S.S.G. § 3B1.3, comment. (n. 1). Testimony at trial established that Bureau of Prisons correctional officers defer to medical staff because medical staff are the subject matter experts when it comes to assessing an inmate's medical needs and providing medical care, and given that deference to defendant Farley's medical expertise, officers did not question or attempt to countermand the defendant's decision to "clear" the victim to be sent to the suicide observation room (where he ultimately died) rather than to the hospital.

Likewise, testimony established that the defendant's role as a nurse was the reason she was contacted by officers to evaluate the victim in the first place; given the officers' deference to defendant Farley's medical position, those officers removed the victim from his cell at defendant Farley's direction, and wheeled him, handcuffed, across the prison compound to the medical unit. That the suffering, visibly disoriented, physically battered W.W. would spend the remainder of his life in an isolated cell, far from the cellmate and correctional officers who had attempted to assist him over the previous day was the result of defendant Farley's deliberate decision-making, facilitated by correctional staff's deference to her medical expertise.

## IV. Sentencing Recommendation

The Government recommends that this Court impose a sentence within the Guidelines range, three years of supervised release, and a $100 special assessment fee. In determining the sentence to be imposed, this Court is guided by the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a). As discussed in greater detail below, a consideration of the Guidelines

and the factors set forth in § 3553(a), including the nature, circumstances, and seriousness of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence, promote respect for the law, and provide just punishment for the offense, weigh in favor of the recommended sentence.  Accordingly, the Government respectfully submits that the recommended sentence is warranted and appropriate.

As an initial matter, the Supreme Court has declared that, "[a]s a matter of administration and to secure nationwide consistency, the Guideline should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 50 (2007).  While this Court may not presume that a Guideline-range sentence is reasonable, the Sentencing Guidelines remain a significant and pivotal component of the sentencing process.  This Court, therefore, "must first calculate the Guideline range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009).

After determining the applicable Guideline range, the Court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a).  Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1).  Additional factors outlined in section 3553(a)(2) include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2).  In this case, as calculated in the PSR, the defendant's Guideline range is 33 to 41 months.  ECF 376 at ¶¶ 72-73.  The United States respectfully submits that, in consideration of the factors set forth in 18 U.S.C. § 3553(a), a sentence within the guideline range is sufficient to promote the purposes of sentencing.

### a. The Court Should Impose a Sentence within the Guideline Range Because of the Nature, Circumstances, and Seriousness of the Offense

This Court must consider the "nature and circumstances of the offense" and "the need for the sentence imposed . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1), (2)(A). A sentence within the Guideline range is necessary to account for the nature, circumstances, and seriousness of the offense at issue here: the brutal and preventable suffering and death of an inmate in the defendant's care and custody.

Defendant Farley was the only medical professional on duty at FCI Petersburg in the late evening hours of January 9 when she observed W.W. in his cell—having learned previously that he had been reported to have fallen—and saw that W.W. was "very disheveled in appearance," that his "pupils were dilated with slurring of speech," and that his gait was "very slow and unsteady." *See* Trial Transcript PageID 1224 (introducing Gov't Ex. 25, Defendant Farley's Clinical Encounter report). Defendant Farley then had the further opportunity—after directing W.W.'s transport from his cell to the medical unit—to even more closely observe W.W.'s deteriorated, alarming condition: she noted (knowing that W.W. had fallen) an "abrasion to the right side" of W.W.'s head; she recorded that his pulse was pounding at 130 beats per minute; she realized that W.W. could not speak to her or communicate; she acknowledged that W.W. was not "oriented to person, place, or time." *Id*. Defendant Farley was a trained nurse with years of experience; she was also admittedly familiar with the BOP's common sense nursing protocols that required nurses to alert a physician when confronted with a patient exhibiting W.W.'s symptoms and injuries or send that inmate to the hospital for medical assessment and care.

Defendant Farley decided—consciously, deliberately—not to do those things for W.W. Instead, she chose to disingenuously engineer his transfer to the isolated suicide observation cell: a room comprised entirely of concrete edges and hard surfaces; a room that was diametrically

inappropriate for the incoherent, stumbling, unsteady W.W.

Defendant Farley knew—in those moments, in real-time—that her decision was wholly inappropriate. She knew that her shift should have ended with W.W. safely enclosed behind the doors of an ambulance speeding to a hospital. She knew that the on-call physician would have ordered her to effectuate precisely this result. And so defendant Farley chose *not* to call that physician, but to instead begin executing the first of her many efforts to cover up her decisions. With W.W. dragged out of her medical unit on a gurney, defendant Farley sat at her computer, and began drafting a report—again, in real-time, when she could have still *corrected* those flawed decisions, changed her mind and decided to do the right thing for her patient—a report that falsely laid the blame for defendant Farley's decision to place W.W.'s in the suicide observation cell on the on-call physician and the on-call psychologist.

Defendant Farley knew, when she returned to the prison a just days later, and was confronted with the fact of W.W.'s death—the reality that her patient had died ten hours after she had engineered his placement into a cell that now looked like a "murder scene"[2]—that an honest accounting of her actions would mean confessing a significant measure of responsibility for W.W.'s injuries and death. So defendant Farley continued to lie and obstruct, telling her supervisor and a co-worker that she had done the right thing—that she had done her job, had contacted the on-call physician, had simply followed orders from a medical doctor.

Defendant Farley knew, when federal investigators came to her with questions about her actions that evening, that an honest accounting of her failures and deceptions would mean confessing a significant measure of responsibility for W.W.'s injuries and death. So defendant Farley repeated the same story she had written on the night of January 9; the same story she had

---

[2]   *See* Trial Tr. Dec. 10, 2024, Testimony of Officer Sherman Smith, at 344; Trial Tr. Dec. 16, 2024, Testimony of Officer Joseph Upton, at 1808 ("There was blood on the walls, on the floor.").

relayed to her medical staff colleagues days later—but this time, with the reality of repercussions sitting across a table from her, defendant Farley more than doubled-down. She did not just make the same false statement. She added details; she embellished her account; she was emphatically, defiantly insistent: Even after she was confronted with the existence of telephone records proving that she had not, in fact, called the on-call physician, and offered the opportunity again to come clean, she said words to the effect, "That's my story, and I'm sticking to it." Defendant Farley lied to federal investigators because she knew—*as she had always known*—that she had failed W.W. in callous and deliberate fashion on January 9, 2021.

A sentence within the Guideline range will capture the significance of the defendant's acts and omissions, and the lasting harms that those failures inflicted on W.W.; his family members, as reflected in the Victim Impact Statements submitted to the Probation Office; and the larger community. Accordingly, the nature, circumstances, and seriousness of the offense warrant a sentence within the Guideline range. 18 U.S.C. § 3553(a)(1), (2)(A).

### b. A Guideline Sentence Considers the Defendant's Criminal History and Characteristics

Section 3553(a)(1) also directs courts to consider "the history and characteristics of defendant." 18 U.S.C. § 3553(a)(1).

At the time that she examined W.W. in January of 2021, the defendant was an experienced nurse, possessed of nearly 20 years of professional nursing experience, and more than six years of experience of nursing within a correctional setting. The defendant was admittedly familiar with her responsibility to be familiar with the Bureau of Prisons nursing protocols and medical best practices, which includes the responsibility to accurately report and document a patient's medical treatment. This experience and responsibility gave the defendant the knowledge and the training to recognize W.W.'s medical needs and respond appropriately. The tragedy of defendant Farley's

actions on the night of January 9, 2021 is that defendant Farley *should* have been precisely the person that W.W. needed that night: she knew exactly what the appropriate medical response was, and how to provide it. She chose, instead, to ignore more than a decade of medical training and experience; to reject the most fundamental precepts of her nursing profession.

A sentence within the Guideline range is warranted to account for the defendant's position as medical professional, responsible for ensuring W.W.'s care and well-being.

### c. A Guideline Sentence Will Afford Adequate Deterrence, Promote Respect for the Law, and Provide Just Punishment for the Offense

Section 3553(a) also directs the sentencing court to consider the need for the sentence to "afford adequate deterrence," "promote respect for the law," and "provide for a just punishment." 18 U.S.C. § 3553(a)(2)(A), (B). A criminal sentence should take into account general deterrence with respect to other prison officials, including prison healthcare workers. 18 U.S.C. § 3553(a)(2)(B). The Fourth Circuit has recognized the importance of general deterrence in fashioning an appropriate sentence in color of law offenses. *United States v. George*, No. 19-4841, 2021 WL 5505404, at *6 (4th Cir. Nov. 24, 2021) (finding probationary sentence of defendant-officer convicted of violating 18 U.S.C. 242 substantively unreasonable and stressing the "principle that public officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under the color of the law they have sworn to uphold").

A within-Guideline sentence affirms the principle that no one, including federal correctional medical staff, is above the law or the Constitution. The law recognizes that correctional medical staff's constitutional obligations include an affirmative obligation to protect the lives and safety of those in their custody. Indeed, a deviation from the Guideline range in this case would send the message that willful dereliction of that duty is not deserving of the sanction that Congress and the Sentencing Commission have deemed to be just punishment based on the

federal courts' collective sentencing expertise accumulated over the decades. A within-Guideline sentence will thus serve to protect the American public not only by affording adequate deterrence, but by promoting respect for the law and these paramount constitutional duties.

### d. A Downward Departure is Unwarranted

The United States, like the Probation Office, has not identified any factors that would support a departure from the applicable guideline range. The defendant's characteristics and history are already contemplated by the Guideline calculation and are not an appropriate basis for a downward departure. *See United States v. Rybicki*, 96 F.3d 754, 759 (4th Cir. 1996) (noting defendant's history of service and family circumstances but stating that because these factors were not "present to an 'exceptional' degree, they may not form the basis for a downward departure.").

## V. CONCLUSION

Based on the factors set forth in 18 U.S.C. § 3553 and consistent with the terms of the plea agreement, the United States respectfully requests that this Court sentence the defendant to a sentence within her properly computed Guideline range of 33 to 41 months' imprisonment, to be followed by three years of supervised release.

        Respectfully submitted,

        Sincerely,

        Erik S. Siebert
        United States Attorney

By: _____/s/_____
        Thomas A. Garnett
        Assistant United States Attorney

        Harmeet Dhillon
        Assistant Attorney General

By: _____/s/_____
        Kathryn E. Gilbert

           Special Litigation Counsel
           Katherine McCallister
           Trial Attorney
           Criminal Section
           Civil Rights Division